SEP 6 2022 PM 3:15
FILED-USDC-CT-NEW HAVEN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Grand Jury N-21-1

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 22cr190 (VAB)(MEG) |
| v. | VIOLATIONS: |
| JUSTIN C. MURPHY | 18 U.S.C. § 1343 (Wire Fraud) |
| | 18 U.S.C. § 1957 (Money Laundering) |
| | 26 U.S.C. § 7201 (Tax Evasion) |

INDICTMENT

The Grand Jury charges:

COUNTS ONE THROUGH FIFTEEN
(Wire Fraud)

1. At all relevant times, defendant JUSTIN C. MURPHY ("MURPHY") was a resident of Connecticut.

2. MURPHY was an owner and principal operator of Mara Investment Group, LLC, also known as Mara Investment Management LP and Mara Investments Global Management LLC (hereinafter "Mara"). Mara was, at varying times, registered as a business in Delaware and Connecticut, with its principal place of business in Greenwich, Connecticut.

3. Mara purported to be, and MURPHY alleged it to be, a hedge fund that solicited and accepted investments as a part of a limited partnership agreement with its investors by which Mara would invest those funds for the benefit of its partnership.

4. At various times, MURPHY employed others at Mara who acted at the direction of MURPHY.

5. In connection with its business operations, Mara maintained two bank accounts at Bank of America, one account ending in 0005 (the "Mara BOA 0005 account") and one account ending in 2023 (the "Mara BOA 2023 account"). At all times relevant, Bank of America had its deposits insured by the Federal Deposit Insurance Corporation. The signatory on the accounts was a Mara employee, although MURPHY primarily directed the use of both accounts.

### The Scheme and Artifice

6. From in or about 2016 through and including the date of the return of this Indictment, in the District of Connecticut and elsewhere, MURPHY knowingly and with intent to defraud devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme did knowingly transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds.

7. The purpose of the scheme and artifice was for MURPHY to enrich himself and others by defrauding investors out of money by means of materially false pretenses, representations, and promises, including:

    a. Falsely representing the nature of the investment strategy MURPHY would pursue with investor funds, when he intended to pursue and did pursue a much riskier investment strategy than he told investors;

    b. Falsely representing that the investment funds provided to him by the investors would be, had been, and continued to be invested as represented, when, in fact, MURPHY intended to divert, had diverted, and continued to divert substantial investor funds for his own personal use and benefit;

      c.     Orally and via email representing to investors that their invested funds were performing more favorably than was in fact the case;

      d.     Providing investors with account statements that materially misrepresented the performance of their investments, including by falsely representing their account balances, when in fact MURPHY had stolen the majority of investment funds; and

      e.     Providing investors with falsified Internal Revenue Service ("IRS") Form 1065, Schedules K-1 (Partner's Share of Income, Deductions, Credits) that falsely reported business income upon which investors would be required to pay tax.

<u>Manner and Means of the Scheme and Artifice</u>

8.     It was part of the scheme and artifice that MURPHY and others working at the direction of MURPHY carried out the following acts, among others.

9.     MURPHY falsely represented to prospective and existing Mara investors that he intended to, and did in fact, use their money to invest in securities.

10.     MURPHY and others working for MURPHY solicited investors for Mara, typically by describing Mara as a hedge fund with a quantitative strategy that balanced long and short positions in securities.

11.     MURPHY and others at Mara claimed that there was a $1 million minimum investment, but often allowed new investors to go below that minimum.

12.     MURPHY provided investors with a "Private Offering Memorandum," or POM, offering "Limited Partner Interests" in Mara Investment Management LP, with the general partner being Mara Investment Group LLC. The POM described Mara's investment objective as "to achieve capital appreciation with limited volatility and low correlation to the overall market," and promised that, when "fully invested," the "investment portfolio will

3

usually consist of long and short positions in the equity securities of 80 or more publicly traded companies, and may also include, without limitation, equities, bonds, preferred securities, convertible securities, equity and index options, and Exchange Traded Funds ("ETFs")." The POM indicated that "the Partnership's positions in 'non-marketable securities' will represent no more than 10% of the Partnership's overall portfolio (in terms of cost at the time of investment)."

13. MURPHY caused new investors to enter into a Limited Partnership Agreement ("LPA") with Mara according to which investors provided money to Mara as capital contributions, which would then be invested by Mara. Under the LPA, investors were to be provided a "capital account" that would be credited or debited a *pro rata* share of profits and losses incurred by Mara. Mara was entitled to collect fees of 2% of assets under management, to be collected at the rate of 0.167% per month, and 20% of investment gains per year. MURPHY claimed to some investors that Mara did not or would not take all of those fees.

14. In truth, however, MURPHY did not use, and did not intend to use, investors' funds as represented, as follows:

    a. First, throughout the scheme, MURPHY did not pass all of the investors' funds into Mara's trading account, and instead diverted substantial portions of those funds to his own personal purposes. The portion of investor funds held back for MURPHY's own purposes increased over time.

    b. Second, throughout the scheme, MURPHY caused funds to be withdrawn from the Mara trading account to be used for, among other things, MURPHY's personal expenses and other personal uses.

c. Third, in approximately 2016 and 2017, MURPHY caused investor funds that were deposited to Mara's trading account to be deployed by a Mara employee in a strategy different from, and much riskier than, what was represented orally to investors and in the POM.

d. Fourth, by 2018, following the departure of the Mara employee who had been directing the deployment of Mara investor funds, MURPHY caused those funds to be used in a new manner, again different from the one described to investors.

e. Fifth, by the end of 2018, MURPHY caused almost all of the investor funds to be withdrawn from the Mara trading account, primarily to be used for MURPHY's personal purposes.

15. MURPHY frequently represented, and caused others at Mara to represent, in writing and orally to investors that their funds would be, and had been, invested as represented. MURPHY and others working at his direction frequently provided investors with account statements that falsely represented their capital accounts and investment performance, when MURPHY well knew that he had not invested their funds as promised.

16. MURPHY caused these false account statements to be sent in order to lull investors into believing their money was safe, to prevent them from pressing demands for redemption of their positions in Mara, and to induce them to invest additional money.

17. MURPHY sent and caused others to send investors falsified Schedules K-1 that falsely reported business income allocated to the investors based on their participation in Mara, and upon which investors would be required to pay tax.

18. MURPHY intended to use, and did use, investor funds to purchase a personal stake in his relative's startup company.

5

19. MURPHY fraudulently solicited and lulled several investors, including but not limited to those with initials J.C., A.C., D.V., M.S., S.S., and G.G., whose identities are known to the Grand Jury.

<u>Executions of the Scheme and Artifice</u>

20. On or about the dates set forth in each count below, in the District of Connecticut and elsewhere, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, MURPHY did knowingly transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, each wiring as set forth below constituting a separate count of this Indictment:

| Count | Date | Description of Interstate Wire Caused by MURPHY |
|---|---|---|
| 1 | September 6, 2017 | Wire transfer of approximately $250,000 from a bank account of investor J.C. to the Mara BOA 2023 account |
| 2 | August 19, 2018 | Email from MURPHY's Mara email address to investors A.C. and D.V. attaching a July 2018 Performance Summary claiming an ending account value of $110,307.83 |
| 3 | December 4, 2018 | Transfer of funds caused by the deposit of a $1000 check from investors A.C. and D.V. into the Mara BOA 0005 account |
| 4 | December 7, 2018 | Email from Mara employee to investor S.S. attaching a November 2018 Monthly Performance Summary claiming an ending account value of $223,145.33 |
| 5 | December 21, 2018 | Transfer of funds caused by the deposit of a $100,000 check from investor M.S. into the Mara BOA 0005 account |
| 6 | January 28, 2019 | Wire transfer of approximately $100,000 from a bank account of investor S.S. to the Mara BOA 0005 account |
| 7 | March 15, 2019 | Email from MURPHY's Mara email address to investor D.V. responding to request for a corrected 2018 Schedule K-1 |
| 8 | March 27, 2019 | Email from a Mara employee to investor D.V. with amended 2018 Schedule K-1 |

| Count | Date | Description of Interstate Wire Caused by MURPHY |
|---|---|---|
| 9 | May 22, 2019 | Wire transfer of approximately $80,000 from a bank account of investor M.S. to the Mara BOA 0005 account |
| 10 | May 31, 2019 | Wire transfer of approximately $70,000 from a bank account of investor M.S. to the Mara BOA 0005 account |
| 11 | November 4, 2019 | Email from Mara employee to investors A.C. and D.V. attaching an October 2019 Performance Summary claiming an ending account value of $126,278.10 |
| 12 | November 18, 2019 | Wire transfer of approximately $150,000 from a bank account of investor D.V. to the Mara BOA 0005 account |
| 13 | November 27, 2019 | Email from MURPHY's Mara email address to investor J.C. claiming "Estimate for the close yesterday was: +1.86% on the month and we are +0.22% on the day, as I type." |
| 14 | December 1, 2019 | Email from MURPHY's Mara email address to investor J.C. attaching an October 2019 Monthly Performance Summary claiming a 5.86% YTD Return |
| 15 | April 7, 2020 | Email from MURPHY's Mara email address to investor J.C. stating that "Portfolio was positive on the day. All is good." |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS 16-20
(Money Laundering)

21.   Paragraphs 1-20 are incorporated by reference.

22.   On or about the dates listed for each count below, in the District of Connecticut and elsewhere, MURPHY did knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, all involving financial institutions engaged in, and the activities of which affect, interstate commerce, such property having been derived from specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, as follows:

| Count | Date | Monetary Transaction |
|---|---|---|
| 16 | September 8, 2017 | Automated Clearing House ("ACH") transfer of $35,000 from the Mara BOA 0005 account to American Express |
| 17 | June 20, 2018 | Transfer of $18,800 in funds via check from the Mara BOA 0005 account to an individual with initials J.S. to |

| Count | Date | Monetary Transaction |
|---|---|---|
| | | pay Murphy's rent |
| 18 | January 29, 2019 | Wire transfer of approximately $100,000 from the Mara BOA 0005 account to a bank account at JP Morgan Chase for a personal investment by MURPHY in a relative's startup company |
| 19 | May 31, 2019 | ACH transfer of $78,000 from the Mara BOA 0005 account to American Express |
| 20 | November 18, 2019 | ACH transfer of $66,254.17 from the Mara BOA 0005 account to American Express |

All in violation of Title 18, United States Code, Section 1957.

## COUNTS 21-23
(Tax Evasion)

23. Paragraphs 1-22 are incorporated by reference.

24. Between 2005 and the present, MURPHY has not filed any personal income tax returns nor made any tax payments to the United States.

25. During each of the calendar years listed below, defendant JUSTIN MURPHY, a resident of Connecticut, received taxable income, upon which there was substantial income tax due and owing to the United States of America. Knowing the foregoing facts and failing to make an income tax return on or before April 15 of the following year, as required by law, to any proper officer of the Internal Revenue Service ("IRS"), and to pay the income tax to the IRS, MURPHY, during the approximate time frames listed below, in the District of Connecticut and elsewhere, willfully attempted to evade and defeat income tax due and owing by him to the United States of America, for the calendar years listed below, by committing the following affirmative acts, among others:

    (a) Failing to maintain any personal bank accounts and instead using Mara business bank accounts and Mara credit cards to incur and pay for his personal

expenses like, for example, rent, rental cars, car payments, car insurance, hotels, jewelry, food and alcohol, and pharmacy expenses;

  (b) Using other Mara employees as signers on Mara bank accounts, even though MURPHY controlled expenditures from those accounts;

  (c) Using Mara funds, rather than personal funds, to acquire a 49% personal ownership interest in a company partially owned and operated by MURPHY's relative, including by contributing $381,889 in 2018 and $169,000 in 2019;

  (d) Utilizing rented homes and cars paid for with Mara funds, rather than acquiring assets in his own name;

  (e) Utilizing cash withdrawn from Mara accounts;

  (f) Arranging for his partnership interest in Mara to be held by Arenal Investments, a shell company controlled by MURPHY that did not file tax returns;

  (g) Causing Mara to fail to file tax returns of its own in any of the years charged below;

  (h) Causing Mara to fail to issue any Forms 1099 or Schedules K-1 reflecting his income from Mara; and

  (i) Providing Mara investors with fictitious Schedules K-1 that reported alleged income earned from their Mara investments, but failing to file those Schedules K-1 with the IRS.

| Count | Tax Year | Return Due Date | Approximate Offense Date Range |
|---|---|---|---|
| 21 | 2017 | April 15, 2018 | January 1, 2017 - present |
| 22 | 2018 | April 15, 2019 | January 1, 2018 - present |

| Count | Tax Year | Return Due Date | Approximate Offense Date Range |
|---|---|---|---|
| 23 | 2019 | April 15, 2020 | January 1, 2019 - present |

All in violation of Title 26, United States Code, Section 7201.

A TRUE BILL

/s/
FOREPERSON

UNITED STATES OF AMERICA

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY